247 S.W.2d 817 (1952)
JONES et al.
v.
LINDER et al.
No. 42601.
Supreme Court of Missouri, Division No. 1.
April 14, 1952.
*819 J. Bernie Lewis, John M. Bragg, Ava, for appellants.
Rogers & Rogers, Gainesville, for respondents.
COIL, Commissioner.
Plaintiffs sued for specific performance of an alleged contract with defendants for the sale and conveyance of real estate or, in the alternative, sought damages for breach. Defendants, by separate answers, denied the contract.
While the petition did not aver that the contract was oral, it developed in the evidence that it was, and no written memorandum thereof was relied upon.
Defendants-appellants rely upon the statute of frauds. The statute was not pleaded but defendants may assert it in bar where, as here, they have denied the existence of the agreement pleaded. Defendants at the first opportunity objected to oral evidence of the contract. Jones v. Jones, 333 Mo. 478, 487, 63 S.W.2d 146, 151[8, 11], 90 A.L.R. 219; State ex rel. Place v. Bland, 353 Mo. 639, 651, 183 S.W.2d 878, 886[8, 9].
Plaintiffs-respondents contend that acts of part performance were proved; that the contract was established by clear and unequivocal evidence; and that specific performance should not be denied because of the statute of frauds.
The trial court found that part performance by plaintiffs was sufficient "to take the case out of the statute of frauds as a matter of law" and entered judgment for specific performance.
In actions of an equitable nature, this court reviews the entire record and determines the weight and value to be given the evidence. We reach our own conclusions as to the facts, deferring, where proper, to the findings of the trial court. Roberts v. Clevenger, Mo., 225 S.W.2d 728, 729[1].
The express and clear language of the statute of frauds, RSMo 1949 § 432.010, V.A.M.S., makes an oral contract to convey real estate entirely unenforceable at law or in equity either by specific performance or by an award of damages for its breach. The statute is a legal justification for refusal to perform a verbal agreement for the conveyance of realty.
Courts of equity will and do in certain factual situations enforce such an oral contract, despite the bar of the statute, either by decreeing specific performance or by an award of damages for the breach in the event specific performance thereof is impossible.
Various reasons have been stated for the intervention of equity. These have been expressed in such phrases as: to prevent fraud, to prevent a virtual fraud, to prevent a constructive fraud, to prevent an equitable fraud, or to prevent the use of the statute of frauds as an instrument to perpetrate a fraud. Kirk v. Middlebrook, 201 Mo. 245, 289, 100 S.W. 450, 462; Roberts v. Clevenger, supra, 225 S.W.2d 731. An examination of many cases from this and other jurisdictions will justify the conclusion that equity will intervene to prevent a gross injustice or deep-seated wrong to one of the contracting parties whether there is in fact any fraud involved; i. e., "fraud" within the ordinary meaning thereof.
This gross injustice or "virtual fraud" referred to is of necessity something more than the failure of one to live up to his oral agreement. It may be morally *820 reprehensible and wrong for one to refuse to do what he said he would do. So, in one sense, there is always some injustice resulting from a violation of a moral obligation, especially when such results in loss to one of the parties of the benefits of his oral bargain. But even where an oral contract is admitted, a party to it may nevertheless assert the statute of frauds as a complete bar to enforcement, and may effectively repudiate any obligation under it, unless other factors to be presently mentioned are involved. Thus, we say this gross injustice or "virtual fraud" of which we speak must be something more and of different kind than the injustice which usually arises from the loss of prospective ownership of a particular property with the pursuant present and future benefits which may accrue therefrom.
Equity generally affords relief where one seeks to enforce an oral contract for the conveyance of real estate: if he adduces proof of performance by him of acts (prior to notice of repudiation by the other), which acts are referable to or, more accurately, are in themselves cogent evidence of the existence of some contract between the parties to convey; and if it appears that such acts have been done in reliance upon the contract of which the acts are evidence and, as a result of the acts performed, the positions of the parties have been so materially changed that it would be grossly unjust or produce a deep-seated wrong to permit the other to rely upon the statute of frauds; and if it appears that the remedy of restitution is inadequate; then the one who would suffer this gross injustice may introduce parol evidence of the terms of the verbal contract; and if by such parol evidence the complete, definite, fair contract to convey which has been pleaded is proved by clear, cogent, unequivocal, and convincing testimony, such party is entitled to specific performance of the oral agreement, or to damages for the breach thereof in instances where specific performance is not possible in whole or in part. This, if we understand the adjudicated cases, is a general statement of the conditions under which the doctrine of "part performance" may entitle one to the enforcement of an oral contract to convey realty. Jones v. Jones, supra, 63 S.W.2d 151 [8-11]; Davis v. Falor, 346 Mo. 514, 517, 142 S.W.2d 76, 78; Emmel v. Hayes, 102 Mo. 186, 195, 14 S.W. 209, 211, 11 L. R.A. 323; Parke & Barron v. Leewright, 20 Mo. 85, 86; Scheerer v. Scheerer, 287 Mo. 92, 103, 229 S.W. 192, 196; Roberts v. Clevenger, supra, 225 S.W.2d 733.
It will be noted that this doctrine of part performance requires that a plaintiff first show the performance of acts which point to or are evidentiary of the existence of the alleged contract between the parties pertaining to the real estate in question. Such proof is a condition precedent to the introduction of parol testimony to prove the specific terms of the oral contract. It is not sufficient that the verbal contract pleaded give color and meaning to acts allegedly performed pursuant to it; the acts performed must first evidence the existence of the pleaded contract. Davis v. Falor, supra, 142 S.W.2d 78[3]; Jones v. Jones, supra, 63 S.W.2d 151[8-11]; Pomeroy's Spec. Perf. of Contracts, Third Ed., § 107, p. 257.
With these principles in mind, we review the evidence in the instant case; first, from a standpoint favorable to plaintiffs.
Plaintiffs, husband and wife, prior to September 26, 1950, owned some property consisting of a grocery store and filling station (and, by inference, living quarters were in some part of the building housing the grocery store) near Hollister in Taney County. Plaintiffs were acquainted with defendants, also husband and wife, who owned by the entirety a farm in Douglas County. One Sunday plaintiffs, Mr. and Mrs. Jones, stopped at the farm of defendants, Mr. and Mrs. Linder, to inquire directions to a place plaintiffs desired to visit. Conversation ensued in which Mr. Linder stated that he would sell his farm and, perhaps at that time, fixed the price at $9750. Mrs. Linder was not present. Plaintiffs indicated that they would return the following Wednesday to examine the property. They did return, examined the property, and again Linder stated to plaintiffs, in the presence of Mrs. Linder, that the price was $9750. It was agreed that plaintiffs *821 would have until the following Wednesday to make their decision as to purchase. On the following Tuesday plaintiffs, with some relatives, returned and, in the presence of both defendants, Mr. Jones stated that he was going to buy the farm. Plaintiffs and defendants proceeded into the Linder home and sat around a table. It was there agreed that a $200 down payment would be sufficient, which Jones made, and for which he received a receipt which recited that $200 cash was received in payment on farm on September 26, 1950. This receipt was signed only by Mr. Linder. There was general conversation respecting the farm; someone, either Mr. Linder or Mr. Jones, drew a rough plat to illustrate the "lay" of the land; a tax receipt was turned over to Mr. Jones in order that he could obtain a legal description of the land preparatory to arranging a loan on it; not a loan with which to pay the purchase price, but apparently for operating capital. Plaintiff later arranged for this loan. There was some mention of others who were interested in buying the farm and the Linders expressed the purpose of calling these others to inform them that the farm had been sold.
The evidence as to the time plaintiffs were to have possession is not entirely definite but in this connection Jones said: "I am going back home and try to sell out my property over there and then I will come over here, and I am going to reduce the price and try to sell it and if I do not sell it, as far as I am concerned, you can stay here all winter, but if I do sell it, I would like to have possession by the first of December, but if I do not sell it by then I will not put you out until the first of the year." The balance of the purchase price was to be paid when the deed and abstract of title were delivered, no definite date therefor being set.
It was suggested that if plaintiffs sold their Hollister property, they would need a place to store furniture and other goods, and the suggestion was made that plaintiffs come and live with the Linders. This offer was refused, but it was agreed that plaintiffs could store their furniture and other possessions in some portion of the Linder home.
Jones did return to Taney County and sold his property. "Yes, I reduced the price of my house and property over there and sold it, * * *." They moved their possessions, including furniture and fruit; the furniture was stored in a front room and the fruit in the basement of the Linder home. The Linders were present during at least some of the times the furniture was unloaded and placed in the house.
The Linders had planned to rewire their home for electricity furnished by REA and had made some tentative arrangements therefor. There were conversations between Mrs. Jones and Mrs. Linder concerning where certain electrical outlets were to be placed pursuant to the wishes of Mrs. Jones. The Linders informed electricians that the wiring of the house was being done for plaintiffs and that the electricians were to receive instructions from plaintiffs and look to plaintiffs for payment. Plaintiffs contracted with an electrician for the wiring of the house (and possibly for the wiring of the barn) for a total cost of $159 upon which indebtedness, payments of $100.01 had been made by plaintiffs at the time of trial. However, plaintiffs' evidence also shows that on the day when the electrician had begun to wire the house and before he was well under way (at least such is the fair inference from plaintiffs' evidence) plaintiffs learned that Mrs. Linder had repudiated the alleged contract and refused to sign a deed of conveyance. With this knowledge, either Mr. Jones or Mr. Linder, or both, told the electrician to go ahead and wire the house.
There was evidence of further conversations between Jones and the Linders about the water pressure system, about plaintiffs' intention to purchase a new floor furnace and a new hot water heater; concerning the purchase of a chicken feeder, kitchen linoleum, and dining room set that belonged to defendants. It appears that the floor furnace, hot water heater, and a pump for the pressure system were perhaps ordered but never delivered or installed. The items of personalty referred to in *822 conversation were not purchased from defendants.
On this Sunday morning when the electrician had begun to wire, plaintiffs, or at least Mr. Jones, learned that Mrs. Linder refused to sign the deed. Mr. Jones attempted to get her to sign a deed the next day but she continued to refuse. Definite dates of occurrences following the conversation of September 26, 1950, are lacking, but the inference from the evidence is that from September 26, 1950, when the $200 was paid, to the time of this repudiation by Mrs. Linder was about 10 days or 2 weeks.
Various witnesses testified to conversations, some with Mr. Linder and others with Mrs. Linder subsequent to September 26, 1950, and presumably (not definitely established) before the time when Mrs. Linder made known to Mr. Jones that she refused to sign the deed, in which conversations Mr. or Mrs. Linder, respectively, stated that they had sold the property to the Joneses.
Defendants' versions of the transaction are different. In substance, defendants say that while Mr. Linder did agree to sell the farm to Mr. and Mrs. Jones for $9750, Mrs. Linder at all times refused to so agree, and refused to sign a deed unless and until her husband found another farm that she would like as well. Mrs. Linder testified that she definitely told Mr. Jones on the night the $200 was paid that she would not sell the place. She stated that she took no part in any conversations pertaining to any agreement to sell; knew nothing about the part payment of $200; took no part in any arrangement whereby plaintiffs could move their furniture into the Linder home, but did not object to its storage when it arrived because she knew that her husband had made that arrangement. In short, she at all times made known to the Joneses the fact that she would not sell and said that plaintiffs' dealings were solely with Mr. Linder. Mrs. Linder admitted having conversations with most of the persons who testified as to her statements, but said these statements were to the effect that her husband had sold the place and that she made it clear in those statements that she hadn't agreed to sell and would not sign a deed. She said she realized that plaintiffs were trying to buy the farm; that she did look at other farms with her husband, which was an effort by her husband to convince her that she should agree to sell their farm for $9750 and move to a place they would like better.
Mr. Linder's version of the details of the transaction was not very different from that testified to by plaintiffs except in the one important respect, viz., that he, Mr. Linder, knew at all times that his wife did not want to sell and had not agreed to sell; that she never had authorized him to sell or to agree to sell. He was of the opinion that he could persuade his wife to sell and join in a deed of conveyance, but he never was able to do so. He did order the abstract brought to date and frankly admitted that the sale would have been consummated if he could have persuaded his wife to agree to sell or to join in a deed of conveyance. He knew that Mr. Jones was attempting to arrange a loan on the property and he knew that the Joneses were planning some further improvements, such as the installation of a floor furnace; but that despite his efforts he could never persuade his wife that she should agree to sell the property or to join him in the execution of the deed conveying it.
We shall make further reference to specific items of testimony as it may become necessary.
We here observe that we do not in this case have a situation in which either by the pleadings or the evidence the contract alleged has been admitted in all its substantial provisions as in Jones v. Jones, supra. It is true that defendant husband admitted substantially the details as alleged, but he denied that any contract was entered into between both defendants and the plaintiffs as alleged. Mrs. Linder denied any contract was ever entered into by her with either Mr. or Mrs. Jones or both.
While we have set forth the substance of all the evidence as it was adduced in the trial court, we must initially eliminate from our consideration parol testimony which tends to prove the terms of the verbal agreement which testimony was admissible *823 only after proof by defendants of acts which themselves were strongly evidentiary of the existence of some contract between both plaintiffs and both defendants to convey the real estate involved. We, therefore, look to the testimony for acts done by the plaintiffs which themselves bespeak a contract and which have probative force to indicate a joint contract by defendants to convey the real estate in question to plaintiffs.
Plaintiffs, with knowledge of defendants, sold their property in Taney County at a reduced price and thereafter moved their furniture and some other small items of personalty to the premises of defendants where the furniture was stored in a front room and some fruit was stored in the basement. With the consent of defendants and in their presence, plaintiffs contracted with an electrician to wire the house and possibly the barn in accordance with plaintiffs' directions and on their credit. Plaintiffs made arrangements for a loan from the Federal Land Bank on the land in question. Plaintiffs paid the sum of $200 on September 26, 1950, for which a receipt was executed only by defendant husband, which recited: "9-26-1950 Rec. of J B Jones Rec cash $200.00 in Payment on From."
It may be doubtful that these acts done by plaintiffs are sufficiently evidentiary of a joint contract on behalf of defendants to convey the real estate in question to plaintiffs, to satisfy the initial requirement mentioned. Certainly the act of plaintiffs in selling the Taney County property is of no significance except as it is connected with the immediate further act of moving the furniture into the Linder house. But even the two acts together do not themselves indicate anything other than an arrangement for the temporary storage of furniture made necessary because of a sale by plaintiffs. The part payment of the purchase price, received only by Mr. Linder so far as the receipt discloses, the contracting for wiring, and the arrangement for a loan on the property might well be said to refer to the arrangement contended for by defendants, viz., that Mrs. Linder would agree to sell the property only if her husband found her a farm that suited her as well, rather than to any joint agreement of Mr. and Mrs. Linder to convey the premises to plaintiffs under the terms of the oral agreement alleged.
Inasmuch, however, as we base our decision herein upon other considerations, we shall assume that the acts proved by plaintiffs were sufficiently evidentiary of and referable to a contract on behalf of Mr. and Mrs. Linder to convey the real estate in question to plaintiffs; sufficient to permit the court to receive parol evidence of the terms of the verbal agreement. We shall also assume that plaintiffs sustained the burden of convincing the trial chancellor that an oral agreement was in fact entered into by both Mr. and Mrs. Linder conveying the farm to plaintiffs for $9750 with possession to be given either on the following December 1 or the following January 1, and providing for the payment of the balance of the purchase price upon delivery of a sufficient abstract and deed within a reasonable time. And we may here say that, assuming as we have that parol testimony to prove the verbal contract was admissible, we agree that the trial chancellor correctly found that such a verbal contract was in fact made.
The difficulty with plaintiffs' position in this case arises when another of the principles of law heretofore mentioned is applied, viz., that the acts of so-called part performance on the part of plaintiffs were of such nature that to refuse to enforce the contract would result in a gross injustice; grossly unjust in the sense that refusal of relief would amount to a deep-seated wrong. Walker v. Bohannan, 243 Mo. 119, 137, 147 S.W. 1024, 1029. "* * * equity does not profess to enforce a verbal agreement simply because it has been satisfactorily established." Pomeroy's Spec. Perf. of Contracts, Third Ed., § 105, pp. 253, 254. See also, Anno. 101 A.L.R. 923, 968-970.
The classical pattern into which many cases fit wherein equity enforces specific performance of a verbal contract to convey real estate is one wherein the vendees *824 have taken actual possession, paid part or all of the purchase price, and have made valuable improvements upon the land. Roberts v. Clevenger, supra; Scheerer v. Scheerer, supra; Hobbs v. Hicks, 320 Mo. 954, 8 S.W.2d 966.
Indeed, the foregoing cases are the very ones upon which plaintiffs rely. In each of those cases, however, there was actual possession, part payment and improvements made. Plaintiffs say their case fits this pattern. We cannot agree. There was no possession of the land ever delivered by vendors or taken by vendees. It is obvious that permissive storage of furniture in a room does not constitute possession. In fact, Mr. Jones testified: "Q. You never pretended to live on the place at any time? A. No. Q. Or claimed to take possession of it? A. No." While we do not say that the mere fact that Mr. Jones said he did not claim to have taken possession is conclusive of the fact that he did not have possession, we do say that his answer is illustrative of the fact that the mere storage of the furniture was not in fact considered to be or thought to be possession within the meaning of "possession" as used in the application of the doctrine of part performance.
Likewise, there were no valuable improvements made upon the land prior to knowledge on the part of plaintiffs of the repudiation of the contract by one of the defendants. As heretofore noted, it was at the time the electrician had just begun to wire when plaintiff Mr. Jones learned that defendant Mrs. Linder had repudiated the contract and, whether Mr. Jones told the electrician to go ahead on the credit of Mr. Jones or whether, as plaintiffs' evidence also showed, it was Mr. Linder who said to go ahead and wire, is of no consequence. The fact is that the improvement (the wiring) was made subsequent to repudiation. Obviously an improvement made after repudiation cannot have been an act of "part performance." Parke & Barron v. Leewright, supra, 20 Mo. 86. We need not decide whether, in any event, mere monetary liability of $159 for wiring done would constitute a valuable improvement such as to come within the meaning of "valuable improvements", the making of which cause an exception to the statute of frauds.
True, $200 was paid on the purchase price. But part payment of consideration alone is not sufficient "part performance" to cause the specific performance of a contract; at least in those instances where payment is in cash as opposed to some other medium, such as personal services. Parke & Barron v. Leewright, supra, 20 Mo. 86; Jones v. Jones, supra, 63 S.W.2d 151; Lydick v. Holland, 83 Mo. 703, 707; Buxton v. Huff, Mo., 254 S.W. 79, 80; Swearengin v. Stafford, Mo., 188 S.W. 97, 98; Davis v. Falor, supra, 142 S.W.2d 78; State ex rel. Uthoff v. Russell, Mo.App., 210 S.W.2d 1017, 1021.
But we are unwilling to hold that in no case may specific performance of an oral contract be had wherein there is neither possession nor the making of valuable improvements. It has been held that possession is an indispensable element in the part performance of a verbal contract for the sale of land. Pomeroy's Spec. Perf. of Contracts, Third Ed., § 117, p. 291. Cf. cases collected in Suppl.Rest., Cont., Vol. 1, § 197, p. 111. We think that once the oral contract to convey has been definitely established, after preliminary proof of acts making parol evidence of the terms of the contract admissible, there is no exact criterion or measuring device which can be arbitrarily applied to determine what acts of part performance are essential. Each case must depend upon its own particular facts with the primary purpose in view of preventing the perpetration of a deep-seated wrong because of the application of the statute. Thus, there may be cases in which a party so changes his position in reliance upon a verbal contract to convey that to prevent the enforcement of that contract would amount to a deep-seated injustice, even though the act done in reliance was not the taking of possession or the making of valuable improvements; and even though the act was not done in execution of the provisions of the verbal contract; and even though the act done was, in a sense, in preparation for, *825 ancillary or collateral to, or in anticipation of, the execution of the provisions of the contract.
This view may be contrary to the rule expressed as: "If a plaintiff should, relying upon a verbal agreement, and with the defendant's knowledge, do something prejudicial to himself in a manner and to an extent not susceptible of compensation in damages, but unconnected with that agreement and not in execution of its provisions, this would fall far short of being the part performance required by the rule, in order to admit the remedial jurisdiction of equity." Pomeroy's Spec.Perf. of Contracts, § 109, p. 265.
We think, however, the view most consonant with the purpose to be accomplished is that anticipatory, preparatory, collateral, and ancillary acts are generally not sufficient part performance to call for an exception to the provisions of the statute of frauds; Lydick v. Holland, supra; Chambers v. Lecompte, 9 Mo. 575; Santoro v. Mack, 108 Conn. 683, 145 A. 273; Anno. 101 A.L.R. 923, 965-967, but that some acts done in reliance upon a sufficiently established verbal agreement to convey, and done with the knowledge of the other party to the agreement, even though not strictly in execution of the contract, may be so disastrous in their consequences to the one performing as to imperatively call for specific performance of an oral agreement. See: Anno. 101 A.L.R. 923, 962-965.
Applying this doctrine to the facts here, we find that the only acts of plaintiffs which may be said to have been detrimental or to have in any sense changed their positions are, that plaintiffs, with knowledge of defendants, sold their Taney County property at a reduced price and moved their possessions to Douglas County, apparently in reliance upon the oral contract to convey. We note, however, that there was no showing of what price was received; whether the reduced price was a good price. Also, that testimony that something is sold at a reduced price is subject to two constructions: one, that the property had theretofore been for sale, was to be sold in any event, but the original asking price was reduced; the other, that the statement: "I sold my property at a reduced price" may mean that it was sold at some sacrifice. There was no evidence of any expense connected with the move, and it may not be inferred that the expense was great. We may not say, at least on the record before us, that the sale of the Taney County property and the move to Douglas County was such an act as would necessarily result in a change in the entire course of plaintiffs' lives.
We may not lose sight of the fact that action which causes an exception to the statute of frauds should be exercised most sparingly. Walker v. Bohannan, supra, 243 Mo. 135, 147 S.W. 1024; Steere v. Palmer, 359 Mo. 664, 668[1], 223 S.W. 2d 391, 392[2, 3]. We further note that defendants received no benefit from the act of plaintiffs in selling their Taney County property; a most important consideration in determining whether equity will intervene. Kirk v. Middlebrook, supra, 100 S.W. 462; Collins v. Harrell, 219 Mo. 279, 309, 118 S.W. 432, 441. We also bear in mind that in the first instance plaintiffs were charged with knowledge of the existence of the statute of frauds and that they therefore sold their property in Taney County knowing that defendants were not legally bound in the event defendants invoked the statute of frauds.
Taking into consideration all these matters, we are of the opinion that the acts of plaintiffs in disposing of their property at a reduced price and moving their possessions, were not, under the evidence in this case, the kind of acts of "part performance" which call for the specific enforcement of an oral contract to convey. These acts were not such that a gross injustice, a virtual fraud, or a deep-seated wrong results to plaintiffs by enforcing the express language of the statute of frauds.
The second count of plaintiffs' petition was for damages for breach of the verbal contract. Certainly, if the verbal contract may not be specifically enforced, the statute also bars any action by plaintiffs *826 to recover damages for a breach of that contract. Lydick v. Holland, supra, 83 Mo. 707; Davis v. Holloway and Smith, 317 Mo. 246, 253, 295 S.W. 105, 108; State ex rel. Fletcher v. Blair, 352 Mo. 476, 483, 178 S.W.2d 322, 325 [9-12].
True, a plaintiff may be awarded damages in those cases wherein the facts justify specific performance, but in which, for some reason, specific performance is not possible or possible only in part. But to permit recovery of damages for loss of the benefits of a bargain, or damages computed by expenditures made in reliance on the oral contract where defendant was not benefited by those expenditures, would be to permit a recovery in an action prohibited by the statute of frauds, i. e., an action to "* * * charge any person * * * upon any contract made for the sale of lands, * * * unless the agreement * * * be in writing * * *." RSMo 1949 § 432.010, V.A.M.S.
Plaintiffs are entitled to restitution. Williston on Contracts, Rev.Ed., Vol. Two, § 536, p. 1553; Davis v. Falor, supra, 142 S.W.2d 78[5-7]. See also, Corbin on Contracts, Vol. 2, § 422, p. 456, 459. Under the evidence in this case, plaintiffs should have restored to them by defendants the sum of $200 part purchase price paid, with interest thereon at the rate of 6% per annum from the time paid to the date of judgment, and the sum of $100.01 paid to the electrical contractor for the wiring done on defendants' premises, with interest thereon from the dates of the respective payments to the date of judgment.
The judgment is reversed and the cause remanded for judgment of restitution consistent with the views herein expressed.
VAN OSDOL and LOZIER, CC., concur.
PER CURIAM.
The foregoing opinion by COIL, C., is adopted as the opinion of the court.
All concur.